ORIGINAL


UNSEALED
7/16/14


FILED
JUL 1 5 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  '14MJ2438 |
| | ) | |
| Plaintiff, | ) | CRIMINAL COMPLAINT |
| | ) | |
| v. | ) | Title 18, U.S.C., Sec. 215 |
| | ) | (Bank Bribery) |
| ROBERT MORENO, | ) | |
| | ) | |
| Defendant. | ) | |

The complainant, being duly sworn, declares under penalty of perjury that the following is true and correct:

INTRODUCTORY ALLEGATIONS

1.  From at least approximately December 2011, until at least approximately April 2012 (the "relevant period"), Defendant ROBERT

1. MORENO ("Defendant") was employed at GMAC Mortgage, LLC ("GMAC"), a mortgage lending institution. As part of his duties, Defendant solicited buyers to purchase distressed or non-performing mortgage notes from GMAC, including notes secured by second deeds of trust on real property.

2. During the relevant period, I.H. owned and operated investment companies, located in San Diego, within the Southern District of California, that purchased distressed or non-performing mortgage notes from lending institutions, including GMAC, at heavily discounted prices. One of these investment companies I.H. operated was known as "Ocean 18, LLC."

3. During the relevant period, GMAC was a financial institution the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC").

## COUNT ONE

### (BANK BRIBERY)

4. Paragraphs 1 through 3 are realleged and incorporated by reference herein.

5. In or around December 2011, in the Southern District of California and elsewhere, defendant ROBERT MORENO, an employee of GMAC, corruptly solicited and accepted things of value greater than $1,000 with the intent to be influenced and rewarded in connection with a business and transaction of GMAC, in that MORENO accepted a check in the amount of $16,149 from Ocean 18, LLC with the intent to be influenced and rewarded in his decision to steer the sale of mortgage notes from GMAC to I.H.

(All in violation of Title 18, United States Code, Section 215.)

This Complaint is based on the attached Probable Cause Statement, which is incorporated fully herein by reference.

JOHN W. ROBERTS
Special Agent
Federal Bureau of Investigation

SWORN to before me and SUBSCRIBED in my presence on July 15, 2014.

HONORABLE MITCHELL D. DEMBIN
U.S. Magistrate Judge

3

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. |
| Plaintiff, | ) | |
| | ) | PROBABLE CAUSE STATEMENT |
| v. | ) | |
| ROBERT MORENO, | ) | |
| Defendant. | ) | |

I, JOHN W. ROBERTS, declare under penalty of perjury that the following is true and correct:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the San Diego Division. I have been employed by the FBI as a SA since October 1999. I graduated from the College of the Holy Cross in 1995, with a degree in Accounting and Mathematics. From 1995 to 1999, I worked as a financial auditor at a major international accounting firm. During this time, I also received a license as a Certified Public Accountant in the Commonwealth of Massachusetts.

2. While working as a SA, I have conducted, or participated in, investigations of various violations of federal law, including white collar crime. Among other things, I have conducted, and assisted in, the execution of numerous arrest warrants, search warrants, and seizure warrants in investigations. Since December 2004, I have been assigned to a squad responsible for investigating white collar offenses. The squad to which I am assigned is referred to as the Corporate Fraud Task Force, and it investigates all forms of economic

crime, including corporate, securities, financial institution, bank and investment fraud.

3. In the nearly ten years I have been assigned to the Corporate Fraud Task Force, I have become experienced in investigations involving economic crimes, including the methods and means employed by individuals who engage in these offenses. In addition to my personal investigative experience, I have consulted extensively with other experienced agents of the FBI, other federal agents and officers, and securities regulators who have expertise in investigations involving economic crime. I have attended training courses covering the topics of fraud and white collar crime, and other types of criminal violations.

4. The facts set forth in this probable cause statement are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses; my review of documents; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the criminal complaint, it does not set forth each and every fact that I or others have learned during the course of this investigation.

STATEMENT OF PROBABLE CAUSE

A. BACKGROUND OF THE INVESTIGATION

5. On approximately May 17, 2014, the FBI hotline received a report that a San Diego-based mortgage finance investment firm was paying bribes to GMAC Mortgage employee ROBERT MORENO and other bank

insiders, and was illegally skimming money from investors. The complainant, referred to in this affidavit as "CW,"[1] worked at the firm from mid-2012 to the present as the assistant to the owner I.H. From approximately 2009 to sometime around May 2014, she was also I.H.'s girlfriend, and lived with him in an apartment in downtown San Diego.

6. In her complaint, and in follow-up interviews conducted with federal agents, CW described that I.H. owned a number of related companies, including Nationwide Servicing Center, Ocean 18, LLC, Instant Mortgage Lending, and Note Tracker Corporation (referred to throughout as "I.H.'s companies" or "NWS/Ocean 18"), which operate from an office in San Diego. Through these companies, I.H. purchased heavily-discounted distressed or non-performing mortgage notes, secured by second deeds of trust on real property, from institutional lenders, including GMAC Mortgage Inc. (now known as Ally Financial; hereinafter, "GMAC"), J.P. Morgan Chase Bank (formerly known as Chase Manhattan Bank; hereinafter, "Chase"), and others. CW related that I.H.'s loan portfolio is valued at approximately $40 to $60 million.

7. According to the Federal Deposit Insurance Corporation ("FDIC") website, GMAC Bank (later acquired by Ally Bank) and GMAC Commercial Mortgage Bank were both FDIC-insured until at least approximately December 2013.

8. As part of his business, I.H. sold shares of these mortgages to investors, who were mostly friends and family of I.H. and his staff. I.H. serviced the mortgage debt by collecting payments from borrowers (or, when a borrower defaulted, he initiated collection or

---
[1] CW is a college graduate with no known criminal history. As described in this affidavit, the information she provided has been corroborated by independent evidence.

3

foreclosure proceedings). The borrowers' monthly mortgage payments were distributed to the investors, less fees and commissions withheld by I.H.'s companies. Typically, investors were issued monthly statements or sent monthly email summaries reflecting the amounts the borrowers paid and fees withheld.[2]

9. According to CW, from approximately 2006 to 2013, I.H. and his employees paid more than $1 million in bribes to bank employees at GMAC, Chase, and National City Mortgage. In return, the bank employees would provide a variety of services, including recommending that their bank approve I.H.'s offers to purchase mortgage loans. I.H.'s payments to the bank employees were made in cash, wire, and check, and were sometimes delivered in person or through FedEx envelopes filled with cash. In order to cover up the payments, some of them were disguised as "consulting fees" or "commissions," or paid to a sham company controlled by MORENO. CW identified MORENO from GMAC, L.S. from Chase, and E.J. from National City Mortgage as bank employees who had accepted payments from I.H.

10. In approximately July 2012, I.H.'s brother A.H., the manager of the NWS/Ocean at the time, left the business, amid a dispute with I.H. over A.H.'s management of the company's finances. In a draft complaint which A.H. threatened to file publicly unless I.H. agreed to

---

[2] In addition to bribing bank employees, I.H., his brother A.H., and others also failed to pay investors their share of the company's income. First, I.H. and A.H. falsely over-reported to investors the amounts paid to obtain the mortgages. In addition, they falsely under-reported to investors the amount of borrowers' monthly loan payments, and kept the difference for themselves. In order to cover up the money they secretly filtered to themselves, I.H., A.H., and others distributed altered and fabricated invoices and statements to investors. This information has been confirmed by A.H. in his draft complaint; by several defrauded investors who filed complaints; and by CW.

4

a settlement, A.H. alleged, among other things, that I.H. paid "unlawful kickback[s]" to MORENO at GMAC and L.S. at Chase. A.H. initiated arbitration proceedings, and on May 22, 2014, sent I.H. a request for discovery. Shortly thereafter, I.H. and others at NWS/Ocean began compiling records in response to A.H.'s discovery request.

11. In May and June 2014, shortly after CW's report to the FBI, and at the request of the FBI, CW began recording her workplace conversations, including conversations with I.H., J.P., the broker of record, and T.D., I.H.'s assistant. In addition, CW provided agents with copies of documents she had been given access to through the course of her employment at NWS/Ocean.

B.  PAYMENTS FROM NWS/OCEAN TO BANK EMPLOYEES

12. As part of the May 22, 2014 discovery request, A.H. asked I.H. for all documents relating to "payments made to any employee or agent of GMAC Mortgage, regardless of how such payments were characterized (i.e., 'commissions,' 'consulting fees,' etc.)..." Handwritten below this request, in what according to CW is I.H.'s writing, is the note "copy of cks AH wrote to Robert". (Based on the checks, described further below, I believe "AH" is a reference to I.H.'s brother A.H., and "Robert" is a reference to MORENO.) Similarly, A.H. requested documents relating to payments made to any employee or agent of Chase. He further specifically asked for records of payments to MORENO and L.S. According to the handwritten notes, I.H. assigned T.D. to respond to this request.

13. On or about May 30, 2014, in a recorded conversation, CW asked T.D. whether she had found any checks from A.H. to MORENO. T.D. replied that she had located a check from "Ocean" to Robert. She also

5

confirmed that all the checks to L.S. came from Note Tracker (an affiliated business). T.D. showed CW spreadsheets showing the amounts they paid for several loans purchased from Chase, and the corresponding amounts paid to L.S. T.D. estimated that L.S. was paid $750 per loan, and her payments, ranging from $1,500 to $5,000 cash, were sent in a monthly Federal Express envelope. She noted an approximately $16,000 check from Ocean, signed by A.H. in December 2011, with the memo, "Consulting Fees." T.D. pointed out that "Robert got a lot more than [L.S.]."

14. The same day, in a recorded conversation, CW asked J.P. about the money sent to MORENO and L.S. J.P. said that he had written checks to MORENO, but not to the Chase employee L.S. When CW expressed concern about these bribe payments, J.P. told her, "they're not bribes, they're kickbacks." He estimated sending around $90,000 the year before last. He pointed out that it would be hard to link the payments to any specific loan purchase, because the money was "spread out." As he put it, "we might have paid in November for something we bought in May."

15. During this conversation, J.P. asked, and then answered, a series of rhetorical questions about the "kickbacks": "Was [I.H.] responsible...? Absolutely." "Do we pay for the loans? Absolutely, we paid for the loans." "GMAC, were they hurt by us buying the loans? Maybe." "Could Robert have been fired? Absolutely..." He explained that they "got preferential treatment" in that the company "got loans cheaper." But J.P. pointed out that the value of the loans is "very subjective" and suggested that GMAC would have a hard time proving that they paid a discounted rate for the loans.

6

16. Ultimately, J.P. estimated that they paid $600,000 to $700,000 in kickbacks. As he put it, "did we do something a little shady...in order to get these loans? Yeah, we did some kickbacks."

17. CW also had a conversation with I.H. on May 30, 2014, and discussed the discovery request. I.H. told CW that he had text message communications and emails with MORENO, but nothing that discussed money, because, I.H. said, "usually I used to delete them right away."

18. I.H. told CW that he was not nervous about the payments to MORENO and L.S. He pointed out that he never paid MORENO directly; instead, he gave money to his father, Z.H., and "sent him [MORENO] to my dad, who gave him money. Yeah, I believe he gave him cash too." He said that he never wrote checks from his own account, only from the business account or A.H.'s account. As I.H. put it, "I was smart." CW clarified, "You were smart you had everybody else write checks except you." I.H. pointed out that the FBI could never prove that he had made payments to MORENO, and asked CW, "They have to have hundreds of witnesses. Don't you watch American Greed? Who is going to witness? Who witnessed that my dad gave him anything?"

19. When CW pressed and indicated that she was worried about the payments to MORENO and L.S., I.H. insisted that they did nothing wrong. He reminded her that they didn't steal the loans; they paid for them, and, indeed, "with Laura [a former GMAC employee] I got better deals than Robert [MORENO]--without any kickbacks." He called the payments "consulting fees" and reminded CW that they had a consulting agreement. But I.H. did concede that they benefited from the payments, in that "they told me more about the product that's coming out. They may have given me the pay history,... maybe read me

7

some notes from the account." In a later conversation that evening, I.H. suggested that he paid MORENO because "he was a nice guy and he was telling me about the [loan] portfolio that was coming out."

20. In the weeks following May 30, 2014, as they continued to compile records responsive to A.H.'s discovery request, CW had several more conversations with I.H., J.P., T.D., and others about the payments to MORENO and L.S., all similar to the conversations described above. On June 3, 2014, one NWS/Ocean employee told CW, "I knew he [I.H.] was paying Robert [MORENO] under the table." He claimed that I.H. told him it was legal, so he let it go. Similarly, on June 5, 2014, J.P. told CW that they paid a "consulting fee" to MORENO, and MORENO would advise them about the mortgage loans GMAC sold. He told her, "it's called steering, steering your business to your buddies." J.P. acknowledged that getting the loans "was a big benefit, because before we kept missing them by a penny or two." In other words, before I.H.'s companies began paying MORENO and L.S., their bids for loans were less successful.

C. RECORDS OF PAYMENTS TO MORENO

21. As previously noted, CW provided documents to the FBI, including many of the records compiled in response to A.H.'s discovery request. These records included copies of checks written to MORENO and L.S., internal accounting records, emails, and other documents that confirm these payments to bank insiders.

22. These records reflect payments to MORENO in return for GMAC loans. According to internal accounting records, reflected on a spreadsheet I have reviewed, Ocean 18 purchased approximately 36 loans from GMAC on January 30, 2012. The spreadsheet lists details of each individual loan purchased, along with the interest rate, unpaid

8

principal balance, and the amount NWS/Ocean paid for the note--which was typically a small fraction of the full balance due. As reflected on the spreadsheet, NWS/Ocean paid GMAC a total of $235,690 for these 36 loans. They paid "Robert" an additional $9,800, for a total payment of $245,490.

23. These records also reflect a number of checks paid directly to MORENO. On December 2, 2011, Ocean 18, LLC issued a check to MORENO for $16,149 for "consulting fee." And in March 2012, A.H., from his personal account, wrote two checks to MORENO for $50,000 and $5,000 respectively, and another $7,000 in April. In total, these records show payments to MORENO of at least $87,949.

24. CW reported that MORENO also accepted cash payments from I.H.'s father, Z.H., at Z.H.'s car wash in New York. In a recorded conversation on May 30, 2014, I.H. confirmed this report, telling CW that he arranged for Z.H. to make cash payments to MORENO. Although he could not remember how much cash Z.H. gave to MORENO, he said that MORENO "made three stops." Based on my training and experience, and my review of these recordings, I believe I.H.'s reference to "three stops" means that MORENO made three trips to Z.H. to pick up cash. (Also on May 30, as described above, J.P. estimated that MORENO was paid $90,000 in checks, but that the total amount of "kickbacks" paid by I.H.'s companies was around $600,000 to $700,000.)

D.  RECORDS OF PAYMENTS TO L.S.

25. According to NWS/Ocean's internal accounting records, at least as early as February 2008, I.H.'s companies began keeping track of "Chase Bank One Fundings" on spreadsheets detailing the loans purchased from Chase, and corresponding payments made to L.S. I have reviewed more than 30 such spreadsheets, created between February and

9

July 2008, which reflect payments to L.S. totaling approximately $49,900. Like the GMAC spreadsheet described above, the Chase spreadsheets list individual loans purchased, interest rate, unpaid principal balance, and the amount I.H.'s companies paid for the note. In addition, each spreadsheet includes an entry for "[L.S.]," with a corresponding dollar amount. For example, according to one spreadsheet, on February 19, 2008, I.H. purchased three loans with a total unpaid balance of $98,575. I.H. paid $17,150 for the three loans, plus an additional $2,250 to "[L.S.]," for a total payment of $19,400. According to CW, and confirmed by comments T.D. made on May 30 and June 9, 2014, I.H. and A.H. would provide T.D. with cash corresponding to these amounts, and T.D. would mail the cash to L.S. via Federal Express.

26. In addition, according NWS/Ocean financial records, Note Tracker Corporation issued at least four checks to L.S. between May 2008 and November 2010, totaling $14,800. The memo field on these checks included the notes "commission," "Loans purchased," "23 accts," and "9 loans."

27. I interviewed L.S. on June 30 and July 1, 2014, near her home in Rockwall, Texas.[3] L.S. acknowledged that she received cash payments from I.H. while she was employed at Chase. She described that I.H. paid her in return for insider information about the other bids, and for her assistance ensuring that I.H.'s companies were approved to purchase loans. She estimated that she received a total of approximately $210,000 in bribes from I.H. and his staff over the course of several years.

---

[3] L.S. was represented by counsel at the July 1, 2014 interview, and spoke to agents subject to a proffer letter whereby the United States agreed not to directly use her statements against her at trial.

10

E. "CONSULTING FEES" AND OTHER COVER-UPS

28. According to CW, and confirmed by recorded conversations with I.H., J.P., and others, I.H.'s companies arranged a "consulting agreement" with MORENO and reported many of the payments to the IRS. CW described that these consulting agreements were created in order to cover up for the bribe payments and lend them the appearance of legitimacy.

29. At some point during MORENO's relationship with I.H., CW described that MORENO established a sham company, and opened a corresponding bank account. The company and its bank account were created so that MORENO could accept personal payments from I.H.'s companies that could not be easily traced to MORENO. CW recalled that MORENO's sham company was called "Phoenix Asset and Acquisition, Inc." CW provided agents with a Bank of America account number for the company, which she obtained from NWS/Ocean's offices. She believed I.H. had arranged to send money to MORENO using this account.

30. Throughout his conversations with CW in and around May and June 2014, I.H. repeatedly maintained that they had done nothing wrong in making the payments, and that they had nothing to hide. Nevertheless, as detailed below, on June 25, 2014, I.H. lied about the payments when asked by a federal investigator.

31. On June 25, 2014, I.H. was interviewed by a federal investigator who inquired about payments to employees at National City Mortgage and other financial institutions.[4] Specifically, the agent asked I.H.:

---

[4] Although the interviewer was a federal agent assigned to the criminal investigation described here, he simply told I.H. he was there as part of an investigation into the mortgage lending and re-sale practices of National City Mortgage and other financial institutions.

11

>Have you ever been approached by an employee of National City Mortgage or any other financial institution who was seeking gifts, meals or any type of payment – either directly or indirectly?
>
>Have you ever provided gifts, meals or any type of payment to an employee of National City Mortgage or any other financial institution – either directly or indirectly?

In response, I.H. falsely denied that he had ever made any type of payments to bank employees. (In fact, internal accounting records from NWS/Ocean show not only that I.H. made payments to MORENO and L.S., but that he also paid an employee of National City Mortgage at least $13,000.)

32. During this interview, I.H. also falsely denied that bank employees could funnel loans his way, noting that "everything has to be approved by someone." He said he did not know if there was an "inside track" that he could be part of, because the banks did not disclose how the loans performed. He said that the bids were sealed, and he did not see anyone else's offers for the mortgage notes sold. I.H. denied that employees ever asked him to raise his bid in order to beat a competitor's bid price.

33. L.S. called I.H. on July 1, 2014, and recorded their conversation at the request of federal agents. During the call, L.S. told I.H. she was interested in finding a new job selling mortgage loans, as she had done before at Chase. She told I.H. she missed getting "that cash in the mail from you." I.H. stopped her, and said, "don't repeat that, because as far as you're concerned, the cash you got was for a gift for your birthday or something." He later insisted that the checks she received were for a "consulting fee or whatever you call it."

34. On July 11, 2014, federal agents interviewed T.D. at her home in Vista, California. When asked about payments to L.S., T.D. admitted that she had mailed cash, but insisted that she did so only one time and that the money was a gift for L.S.'s birthday. When confronted with the agents' knowledge that T.D. had in fact mailed numerous packages to L.S., T.D. conceded that she may have mailed cash a couple of times. Soon thereafter, T.D. declined to speak further with the agents.

D.    <u>MORENO'S STATEMENTS TO FEDERAL AGENTS</u>

35. By early June, 2014, I.H. had become suspicious of CW. When she brought up the payments to MORENO and L.S. on June 2, 2014, I.H. interrupted, "Are you trying to threaten me or something? Are you -- it's like you keep...trying to threaten me." He told her, "Go fucking tell the FBI what we did. I don't care."

36. On or about June 10, 2014, MORENO, who lives in Phoenix, Arizona, visited San Diego. I.H.'s father, who lives in Miami, Florida, was also visiting San Diego. CW made plans to meet MORENO on June 11, 2014. According to CW, the night before the meeting she had scheduled with MORENO, MORENO met with I.H. and Z.H. over dinner. Shortly after MORENO's meeting with I.H. and Z.H., MORENO cancelled his plans with CW. According to CW, she has had no contact with MORENO since that time.

37. On July 2, 2014, I interviewed MORENO in Phoenix, Arizona. During the interview, MORENO acknowledged receiving payments from I.H. and his affiliated companies while MORENO was employed at GMAC. He claimed that I.H. paid him hundreds of thousands of dollars in exchange for "consulting" services he provided. Asked to describe those services, MORENO said that he "would consult with him on

13

different matters within his own personal portfolio." But he called that a "completely different thing" from his employment at GMAC. He pointed out that he had no confidentiality agreement with GMAC. When asked whether GMAC knew that I.H. was paying him, MORENO said it was none of their business. When pressed, he said "the answer is probably no." He then asked whether he was being interrogated because he thought the agents were asking very personal questions.

38. When shown the $50,000 check to MORENO from A.H. dated March 7, 2012, MORENO said that he never cashed that check, and that he had "never gotten a check from A.H. in my life. Never. I don't know where those came from." MORENO also denied that he ever received any payments through I.H.'s father, or that he ever received cash payments from I.H. either directly or through his family or staff.

39. MORENO denied that he provided I.H. with insider information in exchange for the payments. As MORENO put it, "That might be what happened from his [I.H.'s] perspective, but that's not what happened on my end." He said he tried to give I.H. the perception that he was getting a great deal on GMAC loans, so that he would come back with more business.

40. During this interview, MORENO initially said that he did not know how much money I.H. had paid him. He said that I.H. never paid him directly, but instead he was paid by "different entities throughout San Diego." But he said he could not remember whether any of these entities involved I.H. Later, MORENO estimated that he received "a couple hundred grand" from I.H. for helping him out with some loans.

41. Based on the foregoing, there is probable cause to believe that ROBERT MORENO corruptly solicited and accepted money from I.H.

and his companies with the intent to be influenced and rewarded in the connection with the business of GMAC, in violation of 18 U.S.C. § 215.

I declare under oath that the foregoing is true and correct to the best of my knowledge and belief.

JOHN W. ROBERTS
Special Agent
Federal Bureau of Investigation

SWORN to before me and SUBSCRIBED in my presence on July 15, 2014.

HONORABLE MITCHELL D. DEMBIN
U.S. Magistrate Judge