LAURA E. DUFFY
United States Attorney
PHILLIP L.B. HALPERN
Assistant United States Attorney
California State Bar No. 133370
EMILY W. ALLEN
Special Assistant U.S. Attorney
California State Bar No. 234961
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:(619) 546-9738
Fax:     (619) 546-0450
Email:   emily.allen@usdoj.gov

Attorneys for Plaintiff
United States of America

**FILED**

OCT 0 9 2014

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY         CP        DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 14CR2277-BEN |
| Plaintiff, | ) | |
| vs. | ) | **SUPERSEDING INFORMATION** |
| ROBERT MORENO, | ) | |
| Defendant. | ) | |

The United States Attorney charges, at all times material:

SECONDARY MORTGAGE MARKET FRAMEWORK

1.   In   the   United   States,   residential   mortgage   lenders
typically sell the loans they originate to third-party investors, to
the Federal National Mortgage Association (known as "Fannie Mae"), or
to the Federal Home Loan Mortgage Corporation (known as "Freddie
Mac").  By selling these loans, lenders reduce their credit risk and
gain access to additional capital, which in turn provides borrowers
with greater access to mortgage loans.  This secondary mortgage
market   exceeds   $10   trillion,   and   is   essential   to   the   healthy
functioning of the American housing market and the American economy.

2.     Secondary mortgage purchasers often combine the loans they purchase into what is known as collateralized mortgage obligations ("CMOs") or residential mortgage-backed securities ("RMBSs").  CMOs and RMBSs are then typically re-sold to institutional investors such as pension funds and insurance companies.  These products are then also often combined into ever-more complex collateralized debt obligations ("CDOs"), which may include other types of debt obligations such as corporate loans.

3.     This form of mortgage securitization provides increased capital because the risk of default is, in theory, greatly reduced by the aggregation of large numbers of mortgage loans, allowing even high-risk individual loans to be categorized as "safe" investments when they are pooled together.

4.     As a result of the secondary market for mortgages, the connection between borrowers and lenders has weakened, as loan originators no longer have a direct stake in ensuring that individual borrowers can repay their loans.  As a result, secondary purchasers, who bear the risk of default, heavily influence lending standards. As mortgage loans are re-packaged and securitized, collateralized, and re-sold into products seen as "safe" investments, those lending standards deteriorate.   The resulting complexity of mortgage securities products, the lack of regulation and ratings standards, and the abundance of credit availability are often cited as the causes of the financial collapse of 2008.

## BACKGROUND ALLEGATIONS

5.     From approximately 2011 until approximately 2012, defendant ROBERT MORENO ("MORENO") worked as a Market Manager at Executive Trustee Services, LLC (which is now known as Ocwen Loan Servicing),

1   and acted as an agent of General Motors Acceptance Corporation

2   ("GMAC"). GMAC was a bank holding company.

3       6. As part of his job, MORENO sold mortgage loans to third-

4   party investors. These loans included distressed or non-performing

5   second mortgage notes. ~~GMAC~~ MORENO sold the notes to the highest qualified

6   bidder after distributing lists of the loans offered for sale.

7       7. As part of his job, MORENO sold loans to I.H., through

8   I.H.'s business Ocean 18, LLC. I.H. operated Ocean 18, LLC along

9   with his brother, A.H., and his business associate, J.P., from

10   offices in San Diego. Through these businesses, I.H. purchased

11   primarily distressed and non-performing notes from primary lenders,

12   and serviced the loans by collecting payments from borrowers.

13       8. In addition to purchasing and servicing loans, I.H. pooled

14   these loans and sold shares of the pools to investors, primarily

15   friends and family including I.H.'s father, Z.H. The investors would

16   collect returns when borrowers made monthly payments, paid off their

17   mortgage loans, or after foreclosure on the real property collateral.

18       9. As part of his job, MORENO sold loans to B.K., through BGK

19   Investments Inc., a business B.K. owned and operated from Woodland

20   Hills, California.

21                      COUNT ONE

22                  18 U.S.C. § 371

23               (CONSPIRACY)

24       10. Paragraphs 1 through 9 are realleged and incorporated by

25   reference herein.

26       11. Beginning at least in or around December 2011, and

27   continuing through at least in or around July 2013, in the Southern

28   District of California and elsewhere, defendant ROBERT MORENO

1   knowingly and intentionally conspired and agreed with I.H., A.H.,

2   J.P., Z.H., B.K., and others to commit Bank Bribery, in violation of

3   Title 18, United States Code, Section 215, and Tax Evasion, in

4   violation of Title 26, United States Code, Section 7201.

Purpose of the Conspiracy

6          12.   It was the purpose of the conspiracy that MORENO would use

7   his position and influence with GMAC to ensure that I.H. and B.K. won

8   their bids to purchase mortgage notes, and, in return, I.H., A.H.,

9   J.P., Z.H., B.K., and others would pay MORENO hundreds of thousands

10  of dollars in bribes, which in 2011 and 2012 were paid in cash and

11  otherwise concealed from the Internal Revenue Service ("IRS") to

12  assist MORENO in evading federal income taxes on the illicit income.

Manner and Means of the Conspiracy

14         13.   To further the conspiracy, MORENO, I.H., A.H., J.P., Z.H.,

15  and B.K. utilized the following manner and means, among others:

16         a.    MORENO would use his ~~position~~ *influence* with GMAC to ensure that

17  I.H.'s and B.K.'s bids were accepted.   Among other things,

18  MORENO would alter bids, reject bids, and erase or ignore bids

19  from qualified competitors, and would provide I.H. and B.K.

20  inside information about prices and competing bids.

21         b.    In return, MORENO would corruptly accept more than $1

22  million in bribe payments from I.H. and his associates,

23  including A.H., J.P., and Z.H., and from B.K.

24         c.    I.H., A.H., J.P., Z.H., and others would pay MORENO by

25  personal check and in hand-delivered cash payments, in order to

26  conceal the payments and to avoid reporting them to the IRS.

27         d.    In 2011 and 2012, MORENO would file income tax returns

28  in which he would fail to disclose and pay taxes on his illegal

1    income, although he knew that he owed additional taxes on that

2    income.

3         e.  I.H. and B.K. would enter into sham "consulting"

4    agreements with MORENO, in order to disguise the true nature of

5    the bribe payments and to make them appear like legitimate fees

6    paid for consulting services unrelated to MORENO's work with

7    GMAC.

8                              Overt Acts

9         14.  In furtherance of the conspiracy, and to carry out its

10   objects, the following overt acts, among others, were committed

11   within the Southern District of California and elsewhere:

12        a.  In or around late 2011, I.H. offered to make personal

13   payments to MORENO in return for MORENO's help ensuring that

14   I.H.'s bids to purchase mortgage notes were accepted.

15        b.  In or around late 2011, MORENO arranged for I.H. to

16   win his bid for the purchase of several mortgage loans.

17        c.  On or about December 2, 2011, I.H. paid MORENO

18   approximately $16,149, in a check written from I.H.'s company

19   Ocean 18, LLC, which I.H. delivered to MORENO's home in New

20   Jersey.

21        d.  In or around February 2012, MORENO filed an income tax

22   return for tax year 2011 in which he failed to disclose and pay

23   taxes on the illegal income he received from I.H.

24        e.  In or around 2012, A.H. and J.P. wrote large checks to

25   MORENO from their personal bank accounts.

26        f.  In or around 2012, MORENO told I.H. he preferred to

27   receive the unlawful payments in cash, as it made the nature and

28   source of the payments more difficult to detect.

g. In or around 2012, to satisfy MORENO's request, I.H. recruited Z.H. to make hand-to-hand cash deliveries to MORENO.

h. In or around 2012, MORENO met Z.H. on a New York City street corner, where Z.H. handed MORENO a bag containing approximately $20,000 in cash.

i. In or around 2012, MORENO met Z.H. at a New York City car wash, which Z.H. owned, where Z.H. handed MORENO tens of thousands of dollars in cash.

j. In or around 2012, MORENO agreed with B.K. that, in return for personal payments, MORENO would ensure that B.K.'s bids to purchase mortgage notes were accepted.

k. In or around 2012, MORENO arranged for B.K. to win bids for the purchase of mortgage loans.

l. In or around 2012, B.K. hand-delivered approximately $8,000 cash to MORENO in Las Vegas, Nevada.

m. In or around 2012, B.K. hand-delivered approximately $6,000 cash to MORENO in Scottsdale, Arizona.

n. In or around late 2012, I.H. asked MORENO to enter into a sham "Consulting Agreement" to disguise the true nature and source of bribe payments that I.H. owed to MORENO.

o. In or around late 2012 or early 2013, MORENO set up a business, Phoenix Asset & Acquisition, Inc. ("Phoenix Asset"), and a corresponding bank account, which he used to enter into the sham "Consulting Agreement" with I.H. and to receive bribe payments.

p. In or around January 2013, I.H. sent MORENO a written "Consulting Agreement" between Ocean 18, LLC, and Phoenix Asset, which MORENO signed.

1       q.   After he received the "Consulting Agreement" from

2   I.H., MORENO suggested to B.K. that they create a similar sham

3   agreement.  B.K. agreed.

4       r.   In or around January 2013, MORENO created a new

5   "Consulting Agreement" between Phoenix Asset and BGK Investments

6   Inc., which MORENO copied from his contract with I.H.

7       s.   In or around February 2013, MORENO filed an income tax

8   return for tax year 2012 in which he failed to disclose and pay

9   taxes on the illegal income he received from I.H.

10       t.   On or about June 28, 2013, I.H. wired approximately

11   $336,111 to the Phoenix Asset bank account that MORENO

12   controlled.

13       u.   On or about July 18, 2013, B.K. wired approximately

14   $220,000 to the Phoenix Asset bank account that MORENO

15   controlled.

16   All in violation of Title 18, United States Code, Section 371.

17   <u>FORFEITURE ALLEGATIONS</u>

18   14.   The allegations contained in Count One of this Information

19   are hereby re-alleged and incorporated by reference for the purpose

20   of alleging forfeiture pursuant to Title 18, United States Code,

21   Sections 981(a)(1)(C), 982(a)(2), and Title 28, United States Code,

22   Section 2461(c).

23   15.   Upon conviction of conspiracy to, among other objects,

24   violate Title 18, United States Code, Section 215, as set forth in

25   Count One, defendant ROBERT MORENO shall forfeit to the United

26   States, any and all real and personal property constituting or

27   derived from proceeds traceable to the offense, and any property

28   traceable to such property, including, but not limited to, that real

1 | property located at 120 East Rio Salado Parkway, Unit 402, Tempe,
2 | Arizona 85281-9119 (further described as Edgewater at Hayden Ferry
3 | Lakeside Condominium AMD MCR 723-05 Unit 4-02).

4 |     All pursuant to Title 18, United States Code, Sections
5 | 981(a)(1)(C), 982(a)(2) and Title 28, United States Code, Section
6 | 2461(c).

7 |     16.   If any of the property described above, as a result of any
8 | act or omission of defendant: (a) cannot be located upon the exercise
9 | of due diligence; (b) has been transferred or sold to, or deposited
10 | with, a third party; (c) has been placed beyond the jurisdiction of
11 | the Court; (d) has been substantially diminished in value; or (e) has
12 | been commingled with other property which cannot be divided without
13 | difficulty, it is the intent of the United States, pursuant to Title
14 | 21, United States Code, Section 853(p), made applicable herein by
15 | Title 28, United States Code, Section 2461(c) and Title 18, United
16 | States Code, Section 982(b), to seek forfeiture of any other property
17 | of the defendant up to the value of the said property described above
18 | as being subject to forfeiture.

19 |
20 | DATED: 10/9/2014

LAURA E. DUFFY
United States Attorney

22 |
23 | PHILLIP L.B. HALPERN
Assistant United States Attorney

24 |
25 | EMILY W. ALLEN
Special Assistant U.S. Attorney